Submitted on the record December 8, 1997, accused disbarred November 27, 1998

# In re Complaint as to the Conduct of
## JEFFREY T. MURDOCK,
### *Accused.*
## (OSB 96-68; SC S43613)
968 P2d 1270

Jeffrey T. Murdock, *pro se*, filed the brief for the accused.

Chris L. Mullman, Assistant Disciplinary Counsel, Lake Oswego, filed the brief for the Oregon State Bar.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, and Kulongoski, Justices.*

PER CURIAM

* Fadeley, J., retired January 31, 1998, and did not participate in this decision; Graber, J., resigned March 31, 1998, and did not participate in this decision.

## PER CURIAM

The issue in this lawyer disciplinary case is straight-forward: Should a lawyer who embezzles money from his or her law firm be disbarred? We hold that disbarment generally is the appropriate sanction for such dishonesty.

The Oregon State Bar (Bar) charges that the accused violated Code of Professional Responsibility Disciplinary Rules (DR) 1-102(A)(2) and (3), which provide:

"It is professional misconduct for a lawyer to:

"* * * * * ·

"(2)   Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law;

"(3)   Engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

The Bar also charges that the accused violated ORS 9.527(1) and (4), which provide:

"The Supreme Court may disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose, it appears to the court that:

"(1)   The member has committed an act or carried on a course of conduct of such nature that, if the member were applying for admission to the bar, the application should be denied;

"* * * * *

"(4)   The member is guilty of willful deceit or misconduct in the legal profession[.]"

The Bar's complaint alleged in part:

"3.

"At all times material hereto, the Accused was employed as an associate in the Lane County law firm of Thorp, Purdy, Jewett, Urness & Wilkinson, P.C. (hereinafter 'the

firm'). As part of his duties with the firm, the Accused provided contract indigent criminal defense to the firm's clients through an agreement with the State Court Administrator (hereinafter 'SCA'). In addition, he provided certain services to the firm's clients on a flat fee basis.

"4.

"Between September 1993 and September 1995, and while employed by the firm, the Accused diverted payments from the SCA intended for payment for ongoing indigent defense cases and converted those payments to his own use without the firm's consent or knowledge. These payments totaled $6,917.78. During this same time, the Accused had flat fee clients of the firm pay their fees directly to him without the firm's consent or knowledge, and thereby converted the sum of $2,525.00 to his own personal use.

"5.

"During an investigation by the firm into the SCA's failure to pay certain indigent defense accounts, the Accused represented that these particular cases were being handled by a local circuit court judge and that the Accused was one of several lawyers who would soon be reimbursed by court order. This representation was false, and the Accused knew it was false when he made it."

Pursuant to State Bar Rule of Procedure (BR) 3.1, the Bar also filed a petition for interim suspension during the pendency of the proceedings on the above charges. This court appointed a special master to conduct a hearing to determine whether the accused should be suspended temporarily. The accused personally appeared at the temporary suspension hearing and represented himself.

At the BR 3.1 hearing, the accused stipulated that he had violated all the disciplinary rules and statutes alleged by the Bar. After the hearing, the special master found facts in accordance with the accused's stipulation. The special master concluded:

"1. By intentionally depriving the firm of fees and retainers rightfully due the firm and appropriating those funds for his own use, the Accused may have committed the crime of Theft in the First Degree, a Class C felony, as defined by ORS 164.055.

"2. The Accused had a fiduciary duty to act honestly in his dealings with the firm and had an obligation to give it all profits earned for the firm while an employee of the firm. His failure to do so clearly was an act of dishonesty.

"3. Although the Accused is an alcoholic and was addicted to drugs at the time that he converted the funds as described above, the Accused was *not* laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of his acts or that what he was doing was wrong. To the contrary, at all times the Accused recognized the unlawful and dishonest nature of his acts and consciously chose to convert firm funds.

"4. At no time material to his complaint did the Accused exhibit any inability to function that would excuse his conduct." (Emphasis in original.)

As to the question of interim suspension, the special master concluded that the Bar had failed to establish by a preponderance of the evidence that the accused's continued practice of law during the pendency of the proceedings would, or was likely to, result in substantial harm to any person or the public. Notwithstanding, after considering the special master's report, this court found that the accused's continued practice of law was likely to result in substantial harm to the public and, accordingly, temporarily suspended him. BR 3.1(e).

At the hearing before the trial panel, the accused stipulated that he had violated all the disciplinary rules and statutes alleged by the Bar. The trial panel accepted and adopted the special master's findings of fact with the following changes and additions:

"(1) [The special master's] finding No. 11 [that the accused made no effort to reimburse the converted funds until his firm discovered his misconduct] is not accepted. Instead, we find that the repayment of a part of the diverted funds to his employer caused the accused's employer to confront him.

"(2) When confronted, the accused initially denied any alcohol or drug problems; but shortly thereafter he acknowledged that he has a long-term addiction to alcohol and drugs and that he embezzled money from his employer.

"(3) The accused was suspended by the Oregon Supreme Court on March 1, 1997, and remains suspended at this time.

"(4) The accused voluntarily extended his treatment program at Serenity Lane [a drug and alcohol abuse treatment facility] because of his suspension.

"(5) The accused continues to attend weekly group therapy counseling sessions for approximately one and a half hours. He also occasionally receives one-on-one counseling. He expects this program to continue for at least two more months.

"(6) The money converted by the accused belonged to his employer.

"(7) No client was harmed by any of the improper behavior which the accused committed."

The trial panel found:

"Because of the evidence submitted at the Rule 3.1 hearing and the findings made by the Special Master, the accused stipulated that he violated all of the disciplinary rules and the statutes charged in the bar's complaint. Thus, the accused has agreed that he committed an act or carried on a course of conduct of such nature that, if he were applying for admission to the bar, the application should be denied as provided in ORS 9.527(1); that he is guilty of willful deceit or misconduct in the legal profession as provided in ORS 9.527(4); that he committed a criminal act which reflects adversely on his honesty, trustworthiness, or fitness to practice law as provided by DR 1-102(A)(2); and that he engaged in conduct involving dishonesty, fraud, deceit or misrepresentation as provided in DR 1-102(A)(3)."

The trial panel concluded:

"[T]he accused should be suspended for a period of three years commencing from the date a decision on this matter is issued by the Supreme Court; and that he should not thereafter be readmitted to the practice of law in Oregon until he has been clean and sober for an extended continuous period of time and is able to demonstrate that there is in place a support system designed to assist him in maintaining his sobriety."

■ The trial panel reached that conclusion because of the accused's history of drug and alcohol abuse and because of what appeared to the trial panel to be a distinction that this court had made in disciplinary cases involving lawyers who had stolen money from someone other than a client or committed criminal acts in which clients were not injured. In reaching its conclusion that something less than disbarment is appropriate here, the trial panel relied on *In re Stodd*, 279 Or 565, 568 P2d 665 (1977) and *In re Warner W. Gregg*, 252 Or 174, 446 P2d 123 (1968), and on two stipulations for discipline.[1]

Under ORS 9.536(2), and BR 10.1, this court is required to review the trial panel's decision. We review *de novo*. ORS 9.536(3); BR 10.6. We granted the Bar's motion to submit the matter on the record without oral argument. ORAP 11.25(3)(b). The Bar has the burden of establishing misconduct by clear and convincing evidence. BR 5.2. In this case, the accused stipulates that he violated DR 1-102(A)(2) and (3) and ORS 9.527(1) and (4). Accordingly, we proceed to consider the appropriate sanction for his admitted unethical conduct.

## I. SANCTION

The Bar recommends that the accused be disbarred. The accused filed a *pro se* brief in which he argues only that the record does not support disbarment.

The purpose of lawyer discipline is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to discharge properly their professional duties to clients, the public, the legal system, and the legal profession. American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards), Standard 1.1; *see In re Stauffer*, 327 Or 44, 66, 956 P2d 967 (1998) (same).

---

[1] A stipulation for discipline has no precedential value. Many facts and circumstances, most of which are not readily discernable from the public record, motivate a lawyer and the Bar to enter into a stipulation. Moreover, a stipulated sanction providing for a reprimand or suspension not to exceed six months is not reviewed by this court unless the Bar or the accused seeks review. ORS 9.536; BR 10.1.

"Members of the public are entitled to be able to trust lawyers to protect their property, liberty, and their lives. The community expects lawyers to exhibit the highest standards of honesty and integrity, and lawyers have a duty not to engage in conduct involving dishonesty, fraud, or interference with the administration of justice." ABA Standards at 5.

█       In considering the appropriate sanction for the violations found, this court refers to the ABA Standards and Oregon case law. *In re Gustafson*, 327 Or 636, 652, 968 P2d 367 (1998). The court considers four factors: (1) the ethical duty violated; (2) the accused's mental state at the time of the misconduct; (3) the potential or actual injury caused by the accused's misconduct; and (4) any aggravating or mitigating circumstances. ABA Standard 3.0.

## A.   *Ethical duty violated*

█       A lawyer owes a duty to the public to maintain personal integrity and to maintain the public trust. ABA Standard 5.0. Here, the accused engaged in a course of conduct involving dishonesty, deceit and misrepresentation that reflects adversely on his honesty, trustworthiness and fitness to practice law.

A lawyer owes a duty to his clients to preserve his client's property. ABA Standard 4.0. The accused violated his duties to his clients by converting to his own use the fees he received, directly or indirectly, from those clients. When those fees were not received, the firm looked to the clients or, in the case of its indigent clients, to the SCA for payment.

██       Although there is no explicit rule requiring lawyers to be candid and fair with their partners or employers, such an obligation is implicit in the prohibition of DR 1-102(A)(3) against dishonesty, fraud, deceit, or misrepresentation. Moreover, such conduct is a violation of the duty of loyalty owed by a lawyer to his or her firm based on their contractual or agency relationship. *In re Smith*, 315 Or 260, 266, 843 P2d 449 (1992). The accused violated his duties to his law firm. He was compensated on a monthly salary. The accused and the firm understood that he would give the firm any flat fees that he received in exchange for a monthly salary and that any checks that he received from the SCA likewise would go

to the firm. Notwithstanding, within a few months after the firm employed him, the accused began to convert to his own use fees that he received from clients and the SCA. When the firm questioned the accused about the SCA's apparent failure to pay certain indigent defense accounts, he lied in an attempt to conceal his dishonesty. Later, he again lied to his firm when he made partial restitution of the embezzled funds. The accused's dishonesty and deceit is a violation of his duty of loyalty to his firm based on their contractual or agency relationship.

A lawyer owes a duty to the legal system not to engage in conduct that involves dishonesty, fraud, deceit, or misrepresentation to a court. ABA Standard 6.1. The accused violated his duty to the legal system, including his duty to the court and the SCA. The accused converted fees received from fee-paying clients and the SCA belonging to his firm, thus creating a potential dispute between the firm, its clients, the court, and the SCA over whether in fact those fees had been paid. Moreover, the accused represented to the firm that the delay in receiving fees for services to indigent clients was the fault of the court. That was untrue, and the accused knew that the statement was untrue when he made it.

B. *Mental state*

■    The ABA Standards recognize three mental states: intent, knowledge, and negligence. "Intent" is defined as "the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. "Knowledge" is "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Ibid.* The admissions of the accused and the findings and conclusions of the trial panel establish that the accused acted intentionally in embezzling fees from his firm and in misrepresenting the facts in an attempt to conceal his dishonesty.

C. *Extent of injury*

■■    An injury need not be actual, but only potential, to support the imposition of a sanction. *In re Williams*, 314 Or 530, 547, 840 P2d 1280 (1992). The facts of this case show both potential and actual injury.

The accused's clients were injured by the accused's dishonest course of conduct. He embezzled $6,917.78 of indigent defense fees and $2,525.00 of other fees due to the firm. By charging the firm's clients a flat fee and then converting a portion of it to his own use, the accused set in motion a potential conflict between those clients and his law firm. When clients inquired of the firm regarding the discrepancies, the accused lied to his secretary, who innocently repeated those lies to the clients. The accused's law firm suffered actual financial injury.

Before considering any aggravating or mitigating circumstances, the ABA Standards provide that disbarment generally is appropriate when a lawyer: (1) knowingly deceives a client with intent to benefit the lawyer or another and causes serious injury or potentially serious injury to a client, ABA Standard 4.61; (2) engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, fraud, extortion, misappropriation, or theft, ABA Standard 5.11(a); (3) engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously, adversely reflects on the lawyer's fitness to practice law, ABA Standard 5.11(b); or (4) knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system, ABA Standard 7.1.

## D. Aggravating and mitigating circumstances

After a preliminary determination as to sanction has been established, we consider any aggravating and mitigating circumstances in deciding what sanction to impose. ABA Standard 9.1. Aggravating circumstances present in this case are: (1) dishonest or selfish motive, ABA Standard 9.22(b); (2) a pattern of misconduct, ABA Standard 9.22(c); (3) multiple offenses, ABA Standard 9.22(d); and (4) illegal conduct, ABA Standard 9.22(k). Mitigating circumstances present in this case are: (1) absence of a prior disciplinary record, ABA Standard 9.32(a); (2) cooperative attitude with the disciplinary process, ABA Standard 9.32(e); and (3) remorse, ABA Standard 9.32(l).

The Bar disputes several circumstances that the accused argues are mitigating. The accused first disputes the special master's finding No. 10:

"At no time, up to the date of hearing, did the Accused advise the SCA or the Lane County judiciary that he had diverted SCA payments to his own use."

The accused points to no evidence in the record that supports his version of the facts. Contrary to the accused's contention that a letter from the presiding judge referenced in the special master's finding No. 17 supports his claim that he had advised SCA or the court of his misconduct, we find that letter to be silent on that issue. However, the accused does not dispute that, even if he had admitted wrongdoing to the SCA or to the Lane County judiciary, or both, before the hearing, he did so only after his firm detected his embezzlement. The special master's finding #10 was accepted and adopted by the trial panel; we find that finding to be supported by clear and convincing evidence in the record, and we accept it.

The accused next disputes the special master's finding No. 11:

"Prior to the time that the firm discovered the Accused's misconduct, he made no effort to reimburse the firm for fees that he had converted to his own use."

As noted, the trial panel rejected that finding, but it failed to explain *why* it did so. We agree with the special master's finding, which is supported by the record. Before the firm began questioning the accused about his receivables, he never attempted to reimburse the firm. Even then, he attempted to cover up his embezzlement by concocting a story that he was awaiting payment from the trial court. The accused began to repay the firm only *after* the firm discovered his misconduct. The accused admitted that, when he tried to reimburse the firm with that money, which he had borrowed from his parents, he deceived the firm as to the source of the money. Had the accused's firm not discovered his embezzlement, nothing in the record suggests that he would have stopped embezzling or would have reimbursed his firm.

The accused's plea for leniency rests heavily on his admitted long-term addiction to alcohol and illegal drugs. Under ABA Standard 9.32(i) (amended 1992), chemical dependency including alcoholism or drug abuse may be a mitigating factor when: (1) there is medical evidence that the respondent is "affected by a chemical dependency"; (2) the chemical dependency caused the misconduct; (3) the respondent's recovery from the chemical dependency is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely. The Commentary to ABA Standard 9.32 (amended 1992) states, in part:

> "Issues of physical and mental disability or chemical dependency offered as mitigating factors in disciplinary proceedings require careful analysis. Direct causation between the disability or chemical dependency and the offense must be established. If the offense is proven to be attributable solely to a disability or chemical dependency, it should be given the greatest weight. If it is principally responsible for the offense, it should be given very great weight; and if it is a substantial contributing cause of the offense, it should be given great weight. In all other cases in which the disability or chemical dependency is considered as mitigating, it should be given little weight. A showing of rehabilitation from chemical dependency may be considered but should not, in and of itself, be a justification for a recommendation for discipline less than that which would have been imposed upon an attorney in similar circumstances where a chemical dependency was not present."

In this case, the accused presented no medical or other expert testimony to the trial panel to support his claim that he was "affected" by a chemical dependency in a way that should influence the sanction here. The accused states that he used marijuana, mushrooms, LSD, and cocaine, but the record does not show that he used any of those drugs regularly, that he used them while embezzling the firm's fees or while lying to the firm to cover up his crimes, or that he was "affected" by any of those drugs. The special master noted that the Serenity Lane records were devoid of any history of LSD or cocaine use by the accused. Moreover, a counselor from Serenity Lane testified that, at all times material to this

proceeding, the accused was capable of recognizing right from wrong.

*Even if* the accused was "affected" by a chemical dependency at the time when he engaged in misconduct, he has not demonstrated that his chemical dependence "caused" his misconduct. Nor has the accused produced persuasive evidence that he has recovered from his claimed chemical dependency or that his recovery, if any, has arrested his dishonesty and that a recurrence of his misconduct is unlikely.

The accused next argues that he should be given consideration for his "interim rehabilitation by successful participation in an intensive drug and alcohol treatment program." Rather than offering medical or other evidence of recovery, he essentially argues that he should not be held responsible for his unethical conduct. We believe that it is significant that the accused entered into the treatment program at Serenity Lane only *after* his firm confronted him about his dishonesty. Accordingly, we reject the accused's plea of mitigation based on ABA Standard 9.32(i) (amended 1992).[2]

The accused disputes the special master's finding No. 9:

> "At all times material to this proceeding, the Accused was able to distinguish between right and wrong, and he made the conscious decision to convert money that he knew belonged to his employer. The Accused knew, during the time that he converted those funds, that such conduct could result in his disbarment."

The accused *now* claims, for the first time with the filing of his appellate brief that, due to an unspecified chemical addiction, he was unable to distinguish between right and wrong, or that he unconsciously decided to embezzle, or that even if he were capable of distinguishing right from wrong, he was unable to control himself. However, the accused testified at the hearing before the special master:

---

[2] We are not saying that alcoholism or addiction never may be mitigating factors. Rather, we conclude that the accused has not offered persuasive evidence to support his plea for mitigation on those grounds.

"Q:   Mr. Murdock, let me ask you this. Did you, at the time you took this money, did you know it was wrong to take the money?

"A:   Sure I did. I knew it was wrong. * * * I'm not here to minimize my responsibility. I'm not here to minimize my culpability. Yeah, I would have been caught, I knew that from day one. I just didn't care."

The special master found that the accused was able to distinguish between right and wrong, that he made a conscious decision to covert his firm's money, and that he was aware that such conduct could result in disbarment. Moreover, the special master's finding that the accused was able to do legal research, appear in court, socialize with coworkers, and carry out the daily work of a lawyer supports a conclusion that the accused was aware that his course of conduct was dishonest and deceitful but, nevertheless, persisted in it. Those findings, which were adopted by the trial panel, are supported by the record. The accused's own testimony makes it clear that he acted intentionally in embezzling fees due his firm, in lying to cover up his dishonesty, and that he knew that his course of conduct was wrong. We conclude that the accused was able to distinguish between right and wrong during the relevant period.

We conclude that the aggravating circumstances in this case far outweigh the mitigating circumstances.

## II.   OREGON CASE LAW

The remaining consideration is this court's case law. We have found no Oregon case directly on point. The trial panel concluded that this court has distinguished between a lawyer who steals from a client and a lawyer who steals from someone other than a client. The Bar argues, however, that the principle is the same and that it should make no difference whether a lawyer steals money from a client or from his law firm.

*In re Pennington*, 220 Or 343, 348 P2d 774 (1960), supports the Bar's view. In that case, a lawyer had secreted partnership funds over an eight-year period into his own account. He had caused false and fraudulent partnership income tax returns to be filed. The deceit was discovered

when the lawyer's partner had reason to suspect the with-holding. When confronted, the accused admitted his deceit. In rejecting the lawyers's argument that he took no "client" funds, this court noted:

> "It is also urged that the accused has taken no funds of any client. He did not disclose taking his partner's funds until called to account. The long practice of taking and secreting funds not his own reflects directly on his right to be placed in a position to handle other people's property. If these were the funds of a client there would be no hesitancy in imposing the most severe sanction; particularly when we consider the intent evidenced by the long course of conduct. *The same violation of the fiduciary duty to partnership funds is no less abhorrent." Id.* at 349 (emphasis added).

The court explained a lawyer's duty of absolute honesty, stating:

> "True, the rules of professional conduct may fill many pages; the opinions interpreting some of the rules, many volumes. But in the more basic conduct he is called upon to perform, any lawyer knows the simple rules that he must cling to: Simple straightforward honesty and absolute good faith. No less will suffice." *Id.* at 347.

The lawyer was disbarred.

In *In re O.H. Bengtson*, 230 Or 369, 371, 370 P2d 239 (1962), this court stated that it uniformly had disbarred lawyers guilty of embezzlement, "both when such defalcations resulted in criminal conviction of a crime" and "when the defalcation did not result in a criminal prosecution." It is unclear in that case whose money the lawyer embezzled. The lawyer was disbarred.

However, in *In re Lewelling*, 244 Or 282, 417 P2d 1019 (1966), and *In re Sundstrom*, 250 Or 404, 442 P2d 604 (1968), in which the accused lawyers took clients' funds, the lawyers were suspended, not disbarred. In neither of those cases was the misconduct as calculated and inexcusable as those in *Bengtson*. In *Lewelling* and *Sundstrom*, this court recognized that, if an accused lawyer was rehabilitated from whatever condition brought on his culpable conduct, the public would not be harmed by permitting that lawyer again to practice law.

.

In *Gregg*, the lawyer stole $2,000 from an organization of which he was the treasurer. The lawyer argued that his misconduct was the result of alcohol addiction. This court stated:

> "We conclude from the evidence that the accused committed the defalcations because of his addiction to alcohol. However, he knew what he was doing when he cashed at least some of the checks and before the association officials questioned him he was aware that he had committed defalcations.

> "The troublesome question is what form of discipline the public interest requires for a lawyer who admittedly stole $2,000 and whose conduct apparently was caused by alcohol addiction which he has at least for two years overcome.

> "We conclude the public interest requires that we adhere to our past principle requiring disbarment of attorneys guilty of embezzlement and order the accused disbarred. [*Bengtson*, 230 Or at 371].

> "It is true that the accused's conduct was caused by alcohol; however, most embezzlements are caused by pressures of some sort which the embezzler is unable to withstand. The bar and the court owe the public the obligation of keeping out of the practice of law those who cannot withstand these pressures." *Id.* at 177-78.

Thereafter, this court on reconsideration modified its earlier opinion as follows:

> "If it appears likely that a disciplined attorney may become rehabilitated within a few years and, therefore, should be permitted to resume the practice of law, suspension and not disbarment is the appropriate discipline." *Id.* at 179.

On reconsideration, the *Gregg* court did not address the issue of *whose* money the lawyer stole. Rather, the court focused only on the lawyer's potential for rehabilitation. The court did not change its policy that disbarment is the proper sanction in instances of planned, rational misconduct where the odds against true rehabilitation are so great that the likelihood of reinstatement in minimal. *Id.* at 181. Because the lawyer's conduct after his misconduct persuaded the court that he was well on the road to rehabilitation, the court

changed the sanction to a suspension for three years and thereafter, until the lawyer affirmatively showed that he was rehabilitated and that his resumption of the practice of law would not be detrimental to the bar or the public. *Id.*

In *Stodd,* the accused lawyer converted the funds of a nonprofit organization, of which he was the president. Apparently, he had returned most of the money before his embezzlement was discovered, at which time he repaid the balance with interest. *Id.* at 567. He had no prior disciplinary record. This court considered *Gregg* and concluded that Stodd's misconduct was less serious than Gregg's:

> "Nothing less than the most scrupulous probity in dealing with the funds of others is compatible with admission to the practice of law. This is a standard that does not permit drawing a line between an attorney's professional and his non-professional roles. Under the Disciplinary Review Board's recommendation, the accused will have the burden, after a two-year suspension, to demonstrate that he can be trusted with this and other obligations of professional practice. We conclude that the board's recommendation is proper, and we adopt it." *Id.* at 567-68.

In *In re Pierson,* 280 Or 513, 518, 571 P2d 907 (1977), this court held that even a single conversion by a lawyer to his own use of his client's funds will result in permanent disbarment. In *Pierson,* this court clearly signaled that, notwithstanding some of this court's earlier disciplinary decisions, the court would not look with leniency on a lawyer who misused the funds of someone other than a client. *Id.* at 517-18 n 1. The lawyer was disbarred.

In *In re Holman,* 297 Or 36, 62-63, 682 P2d 243 (1984), the accused offered expert medical testimony that the drugs that he had been taking caused an impairment so disabling that it negated a culpable mental state. This court stated:

> "In disciplinary proceedings this court makes its own independent review of the evidence and, upon the basis of the evidence and the entire record, must determine where the truth lies. If this court is convinced that by reasons of his addiction this accused was unable to appreciate the wrongfulness of his acts, protection of the public will only demand

that he not be allowed to practice until such time as his mental impairment can be determined to be a thing of the past. On the other hand, if upon review of the entire record and the evidence this court is convinced that the accused took and commingled money at a time when he was able to appreciate the wrongfulness of his act, he should be disbarred."

The lawyer was reprimanded and placed on probation for more than three years and thereafter "until such time as the accused can persuade this court that the probation should be terminated." *Id.* at 69.

In *In re Laury*, 300 Or 65, 76, 706 P2d 935 (1985), this court noted:

"Since the time of the *Gregg*, *Lewelling*, *Sundstrom* and *Stodd* decisions, we have spoken to misappropriation of clients' funds in no uncertain terms in *In re Pierson*, 280 Or 513, 571 P2d 907 (1977), in which we did disbar the lawyer. In that opinion at footnote 1, 280 Or 517-18, we intimated that we believed the sanction in *Gregg* and *Stodd* to be inadequate. We went on to state:

" 'We hold that a single conversion by a lawyer to his own use of his client's funds will result in permanent disbarment.' 280 Or at 518.

"Citations to cases earlier than *Pierson* for lenient treatment of misappropriation of funds by lawyers is no longer of any avail." *Id.* at 76.

In *Laury*, the accused lawyer commingled and converted his client's money to his own use. The lawyer was disbarred.

In *In re Eads*, 303 Or 111, 734 P2d 340 (1987), a lawyer was addicted to alcohol, marijuana, and cocaine during the period of the acts charged. He argued that his addiction precluded him from appreciating the wrongfulness of his acts and, therefore, that he did not have the intent required to find that he had misappropriated funds. Alternatively, he asked the court to impose a sanction with primary emphasis on rehabilitation. *Id.* at 121-22. The accused offered substantial evidence that he had embarked on a rehabilitation program and that he had been drug free for several years. This court concluded, however, that, because of the gravity of the

accused's misconduct, his drug or alcohol dependency should not reduce the sanction. The lawyer was disbarred.

In *In re Benjamin*, 312 Or 515, 823 P2d 413 (1991), a lawyer failed to promptly pay money to clients, used clients' money for personal expenses, neglected legal matters, and failed to cooperate with the disciplinary process. The lawyer was disbarred. *See also In re Phelps*, 306 Or 508, 520, 760 P2d 1331 (1988) (where an accused "steals funds from a client, the sanction is disbarment," despite mitigating circumstances); *In re Jordan*, 300 Or 430, 712 P2d 97 (1985) (multiple ethical violations, including commingling and converting client's funds, resulted in disbarment). We also find support for our conclusion in *In re Biggs*, 318 Or 295, 864 P2d 1310 (1993), *Smith*, and *In re King*, 320 Or 354, 883 P2d 1291 (1994).

The accused admits: that he violated the rules and statutes as charged in the Bar's complaint; that, over a two-year period, he embezzled more than $9,000 from his law firm for his personal use; initially, he lied to his law firm in an unsuccessful effort to conceal his dishonesty; he later lied to his law firm about the source of $5,000 that he intended as a partial repayment of the money that he had taken; at the time that he embezzled the firm's money, he knew that it was unlawful for him to do so; and he knew that his course of conduct could lead to his disbarment.

The evidence clearly and convincingly demonstrates that the accused embarked on a course of conduct involving dishonesty and deceit that reflects adversely on his fitness to practice law. This court often has stated that, generally, a lawyer who converts a client's funds will be disbarred. In this case, the accused embezzled more than $9,000 from his law firm. We conclude that the sanction should be the same, *i.e.*, disbarment generally will follow embezzlement from a lawyer's law firm.

We have considered carefully the accused's plea for leniency on the basis of his alleged alcoholism and chemical dependency, and we reject it. On these facts, the accused has not presented evidence that would justify the imposition of any sanction less than disbarment. We conclude that the accused must be disbarred.

The accused is disbarred.